IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CHRISTINE M. DOWD, DAMON M.      )
MORRIS, and ROY I. MORRIS,       )
                                 )
        Plaintiffs,              )
                                 )
    v.                           )    Civ. No. 10-82-SLR
                                 )
NEW CASTLE COUNTY, DELAWARE,     )
                                 )
        Defendant.               )

Thomas C. Marconi, Esquire and Paul E. Bilodeau, Esquire of Losco & Marconi, P.A., Wilmington, Delaware. Counsel for Plaintiffs.

James H. Edwards, Esquire, Harshal Purohit-Patel, Esquire and Megan K. Sanfrancesco, Esquire of the New Castle County Law Department, New Castle, Delaware. Counsel for Defendant.

## MEMORANDUM OPINION

Dated: April 13, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On February 1, 2010, plaintiffs Christine M. Dowd, Trustee of the Victor L. Minter Revocable Trust f/b/o Damon M. Morris (the "Trust"), Damon M. Morris in her individual capacity, and Roy I. Morris (collectively, "plaintiffs") filed the present action against New Castle County, Delaware (the "County" or "defendant"). (D.I. 1) The Trust is the record owner of the single family residence located at 414 Foulkstone Road in Wilmington, New Castle County, Delaware (the "Premises"). (*Id.* at ¶ 3) In their complaint, plaintiffs argue that the defendant's instant ticketing system, which allows the County to collect civil penalties for property code violations prior to providing a hearing on the issue, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Plaintiffs brought this suit as a class action on behalf of all County residents who have been fined under the accused ordinance. (*Id.* at ¶ 28) A motion to certify class is pending. (D.I. 10) In their complaint, plaintiffs requested injunctive relief against the enforcement of the accused ordinance, damages in the amount of the penalties collected by defendant under the ordinance, punitive damages and costs. (D.I. 1 at ¶ 36) The court previously granted in part and denied in part defendant's motion to dismiss for failure to state a claim. (D.I. 24) Thereafter, whereas plaintiffs did not meet the required showing of irreparable harm, the court denied plaintiffs' request for a preliminary injunction and, concurrently, it ordered that the parties engage in focused discovery. (D.I. 26) Currently before the court are the parties' cross-motions for summary judgment. (D.I. 37, 38) The court has jurisdiction over the present suit

pursuant to 28 U.S.C. § 1331. For the reasons that follow, the court denies plaintiffs' motion and grants defendant's motion.

## II. BACKGROUND

This case involves defendant's adoption and enforcement of ordinances relating to the maintenance of private property in New Castle County. Plaintiffs Damon and Roy Morris have resided on the Premeses for the past fourteen years. (D.I. 1 at ¶ 3 & ex. M; D.I. 5 at 3) On this property exists a "brush pile" – a pile of tree limbs and twigs – constructed by Mrs. Morris fourteen years ago.[1] The brush pile existed sans concern until May 2009, when it ignited the dispute underlying the current litigation.

### A. New Castle County Code

The court's discussion of the (2008) code at issue is best framed by a review of the laws it amended. In 2005, the County enacted "Substitute No. 4 to Ordinance No. 04-057 as amended by Floor Amendment No.1" (the "2005 Ordinance"), creating Chapter 7 of the New Castle County Code entitled "Property Maintenance Code" (the 2005 "PM Code"). (D.I. 40 at SJ3 et seq.) The PM Code is derived from the International Property Maintenance Code and addresses many common property concerns, for example, accumulation of rubbish and improper maintenance of exterior structures. The adoption of the PM Code by the 2005 Ordinance was expected to "have no discernable fiscal impact" on the County. (*Id.* at SJ5 ("Fiscal Note"))

---

[1]The Delaware News Journal reported in February 2010 that the brush pile is approximately six feet by three and a half feet in size. *See* http://m.delawareonline.com/detail.jsp?key=299466&rc=ts&full=1 (last accessed May 21, 2010). Defendant has included several color photographs of plaintiffs' brush pile in connection with its motion. (D.I. 38, ex. 1)

As enacted, the 2005 PM Code provided for both civil and criminal enforcement of its provisions. Criminal actions could be initiated by either the Code Official[2] or the County Attorney in the Courts of the Justices of the Peace, with convictions being appealable to the Court of Common Pleas. (Section PM 106.3.2.2 (2005),[3] citing 11 Del. C. § 5917) Violations of the 2005 PM Code were deemed misdemeanor offenses and carried penalties ranging from $200 to $500 for the first criminal conviction and from between $250 to $1000 for a second conviction. (Section PM 106.3.2.3 (2005)) Separate criminal convictions could be obtained for each day any violation of the PM Code went unabated. (Section PM 106.3.2.4 (2005)) Alternatively, the 2005 PM Code provided that the County Attorney (or his or her designee) could initiate a civil proceeding for injunctive relief "to prevent, restrain, correct, abate, remove, or enjoin any violation" of the PM Code in the Court of Chancery. (Section PM 106.3.3 (2005))

Administrative enforcement was a third avenue of governmental redress provided for by the 2005 PM Code. Under this enforcement scheme, notice of the violation would first be provided to the owner or person(s) responsible for the property.[4] (Section PM 106.3.1.1 (2005)) Notice was not required where the same violation was

---

[2]The PM Code defines "Code Official" as "[t]he Department of Land Use employee designated by the General Manager of the Department of Land Use who has the authority to administer and enforce this Chapter, or his or her duly authorized representative." (D.I. 40 at SJ19)

[3]For ease of reference, the court adopts the form of citation utilized in the PM Code and cites the code directly. The 2005 PM Code is of record at D.I. 40 (at Bates nos. SJ3-SJ31).

[4]The PM Code refers to the "owner" of or "person responsible" for a property; for simplicity, the court will refer simply to the "owner" to denote an alleged PM Code violator.

previously noticed (at any time), or when the violation jeopardized the health and safety of the public. (Section PM 106.3.1.1.3 (2005))

Section PM 106.3.1.2 provided for a pre-deprivation show cause hearing, as follows:

> *Pre-deprivation show cause hearing.* If such violations are not remedied within the time specified, the Code Official shall schedule a Show Cause Hearing and provide the person an opportunity to defend his . . . conduct at a Show Cause Hearing prior to any penalty being imposed. After such Show Cause Hearing, the Code Official shall render a decision within twenty (20) days and send a written letter to the person informing them of his or her decision and detail the reasons for any adverse action taken. Any decision made by the Code Official is appealable pursuant to Section PM 106.3.1.5.

A two-hundred dollar ($200.00) administrative fine was assessable "for each day that the violation continue[d] in addition to any expense incurred by the County for the removal or abatement of the violation." (Section PM 106.3.1.4.1 (2005)) The owner was also deemed responsible for the costs of the enforcement of the 2005 PM Code as well as the costs of removal of the violation, or remediation, abatement, demolition, and the like. Those costs would be imposed as "liens on the property to the extent permitted by law." (Section PM 106.3.1.3 (2005))

An appeal process was provided by the 2005 PM Code. Adverse decisions by the Code Official following the show cause hearing could be appealed (for a fee) to the Board of License, Inspection and Review (the "BLIR") within twenty (20) days of the written decision.[5] (Section PM 106.3.1.5.1&2 (2005)) A public hearing was then afforded within forty-five (45) days of the filing of the appeal. (Section PM 106.3.1.5.2

---

[5]The 2005 PM Code provides for an appeal fee as set forth in an appendix to chapter 6 of that code, which does not appear to be of record.

(2005)) A property owner could request a stay of the action being appealed by submitting a written request to the General Manager of the Department of Land Use, who was to grant the stay unless the Code Official demonstrated that such a stay would jeopardize the public welfare. (Section PM 106.3.1.5.6 (2005)) The BLIR was required to render a written decision within twenty (20) days of the public hearing. (Section PM 106.3.1.5.4) The BLIR's decision could be appealed by writ of certiorari to the Delaware Superior Court. (Section PM 106.3.1.5.8 (2005))

In June 2008, defendant adopted "Substitute No. 1 to Ordinance No. 08-073 to amend New Castle County Code Chapter 7" (the "2008 Ordinance"). (D.I. 1 at ¶ 9, ex. B)[6] The recitals section to the 2008 Ordinance detail the defendant's rationale in amending the PM Code (hereinafter, the "2008 PM Code"). Defendant asserted that the criminal penalties imposed by the 2005 PM Code were ineffective, citing an approximately six month wait between the filing of criminal charges by the Office of Code Enforcement and the scheduling of a trial. (Id., ex. B) By contrast, "subjecting property owners to civil penalties will allow for quicker resolution of code enforcement cases, have a greater deterrent effect on this unlawful conduct, and also eliminate the costs associated with criminally prosecuting offenders[.]" (Id.) Unpaid civil penalties

_____

[6]The bill amending Ordinance No. 08-073 is of record as exhibit B to the complaint. It was introduced on June 10, 2008, adopted by the County Council of New Castle County on June 24, 2008 and signed by then county executive Christopher Coons on July 1, 2008. The changes were codified through Ordinance No. 09-117 on December 8, 2009. A complete copy of the 2008 PM Code (absent the recitals) is docketed as an exhibit to plaintiffs' opening summary judgment brief. (D.I. 39) It is also available online at http://library.municode.com/HTML/11287/level3/PTIICO_CH7PRMACO_ART1STPRMA .html (last accessed April 4, 2011). Hereinafter, the court will cite the 2008 PM Code directly.

could be added to defendant's property tax billing for the cited property, and may give rise to property liens. (*Id.*) Defendant also "intend[ed] to create a new appellate procedure applicable to the civil penalties imposed to make the appellate procedure more efficient and ensure the uniform and proper application of the [PM Code's] provisions." (*Id.*) It was expected that the new provisions would generate over $37,000 in net revenue in the first year and enable defendant to add over $276,000 directly to the property tax bill for collection. (*Id.* ("Fiscal Note"))

In enacting the 2008 Ordinance, defendant established what is commonly referred to as the "Instant Ticketing System for Common Violations" (the "ITS"). The ITS may be used to issue tickets to the "owner" of a property, regardless of whether he or she resides on the premises, for violations of the 2008 PM Code sections relating to: prohibited growth of weeds and grass; accessory structures; inoperable or unregistered vehicles; oversized vehicle parking; parking of vehicles; outside storage of household items; responsibility to keep shrubs and trees trimmed; swimming pools; outside storage of debris; accumulation of rubbish; and disposal of rubbish. (Section PM 106.3.1.2 (2008))

The following ITS procedure was established by the 2008 PM Code. Upon receipt of a complaint, a "notice of alleged violation(s)" is mailed to the owner. (Sections PM 106.3.1.2.1 & PM 106.3.1.2.2 (2008)) The owner is thereafter responsible for correcting the violation within ten (10) calendar days. If the Code Official determines that the violation persists beyond this point, a $50 ticket is issued by mail. "This civil penalty shall double if not paid within thirty (30) calendar days from the date of the citation." (Section PM 106.3.1.2.1 (2008)) A Code Official is not required to

6

provide a violation notice prior to ticketing the same violation occurring within a twelve-month period. (*Id.*) The 2008 PM Code (like its predecessor) provides that a separate citation may issue for each twenty-four (24) hour period that the condition giving rise to the initial citation continues. (Section PM 106.3.1.2.2 (2008)) These additional penalties also double if not paid after thirty (30) days. (*Id.*)

The appeal process for the ITS is described as follows.

Section PM 106.3.1.2.4, Appeals. The owner of a property aggrieved by any civil penalty imposed pursuant to this Section may appeal to the Department of Land Use Code Official by sending a **detailed written explanation** of the grounds for the appeal, **along with payment in full of the civil penalty**, to the Code Official within twenty-one (21) business days of the date of the citation. The Code Official shall forward the payment to the Office of Finance, which will credit such payment. The Code Official shall issue a written decision affirming, modifying, reversing, revoking or vacating the civil penalty within forty-five (45) calendar days of receipt of the written explanation of the grounds for the appeal. In the event the civil penalty is reversed, revoked, vacated or decreased in amount, the appellant shall be reimbursed for payment of the portion of the civil penalty vacated or decreased. **Each citation received must be appealed separately.** The decision of the Code Official must be appealed in accordance with Section PM 106.3.1.5, Administrative Appeals.

(Section PM 106.3.1.2.4 (2008)(emphasis added))

It appears as though this citation (to PM 106.3.1.5) is incorrect, insofar as Section PM 106.3.1.5 concerns "Administrative penalty provisions" such as fines and the institution of remedial action, while Section PM 106.3.1.6 concerns "Administrative appeals." According to Section PM 106.3.1.6, an appeal of the Code Official's decision (or any enforcement action under the 2008 PM Code) may be taken to the BLIR for an appeal fee within twenty (20) days of the issuance of the adverse written decision. A public hearing will be held within forty-five (45) days of the filing of the appeal, and the BLIR shall issue its decision within twenty (20) days of the hearing. (Sections PM

106.3.1.6.2&4 (2008))  As with the prior scheme, a stay of the action being appealed may be requested in writing to the General Manager of the Department of Land Use. "The stay **will be granted** unless the Code Official can demonstrate that the granting of the stay would jeopardize the health, safety, or welfare of the public."  (Section PM 106.3.1.6.6 (2008)) (emphasis added)  The BLIR's decision may be appealed by writ of certiori to the Delaware Superior Court.  (Section PM 106.3.1.6.8 (2008))  These appeal provisions do not differ from the 2005 PM Code.

The 2008 PM Code also provides for the "[a]batement of [a] violation" by the Code Official or his designee when an owner "fails to correct the violation after due notice, either actual or constructive, has been given to the person responsible, and where such person has had the opportunity to be heard by an administrative tribunal **or** court of competent jurisdiction on the issue of the violation."  (Section PM 106.4 (2008)) (emphasis added)  The County is permitted to seek reimbursement for all costs of abatement by, *inter alia*, attaching a lien to the property.[7]  An appeal of the abatement costs may be made to the BLIR or pursued in litigation, however, an unsuccessful litigant must pay the County's attorney fees.  (Sections PM 106.4.1&2 (2008))

A significant difference between the 2005 and 2008 PM Code concerns the ability of an accused to contest an initial citation under the ITS.  The pre-deprivation

---

[7]"The owner of the property or person responsible for the building, structure, premises or equipment shall be responsible for all costs associated with the enforcement of this Code and the investigation, removal, remediation or abatement of Code violations including the costs of reports, studies and opinions prepared by design professionals, the institution and maintenance of temporary safeguards, restoration of unsafe buildings, structures or equipment, demolition, and reasonable attorney fees associated with the above.  The costs shall be liens on the property to the extent permitted by law."  (Section PM 106.3.1.4 (2008))

show cause hearing is no longer available for these certain (more common) types of property code violations. (Section PM 106.3.1.3 (2008) (excluding citations given under Sections PM 106.3.1.2); *compare* Section PM 106.3.1.2.4 (providing procedure to appeal instant ticket)) Plaintiffs argue that the 2008 PM Code violates the Due Process Clause of the Fourteenth Amendment by depriving individuals of their property (i.e., money) as a condition precedent to any opportunity to contest the charge.

The court also adds that, although there is no appeal fee associated with the first level of review (appeal to the Code Official), see Section PM 106.3.1.2.4 (2008), the 2008 PM Code provides a fee for filing an appeal of the Code Official's decision to the BLIR. (Sections PM 106.3.1.6.7 & 101.8 (2008)) It does not appear that either party has submitted the relevant appendix containing the fee schedule, however, the parties do not debate that the appeal fee to the BLIR was, at least at the time utilized by plaintiffs, a non-refundable fee of five hundred dollars ($ 500).

### B. The 2008 PM Code as Applied to Plaintiffs

The court next describes the plaintiffs' actual experiences with defendant's ITS. On May 8, 2009, plaintiffs received a "Courtesy Letter" from the County's Department of Land Use dated May 6, 2009 (the "courtesy letter"). (D.I. 40 at SJ36-SJ38)[8] According to Code Enforcement Officer Christopher Yasik ("Yasik"), the courtesy letter was sent in response to a complaint for the property regarding "debris piles in the backyard where foxes and raccoons have set up nest." (D.I. 38, ex. 4 at ¶ 3) The courtesy letter

---

[8] The court will hereinafter cite the summary judgment record where applicable. Certain documents were not resubmitted during this round of briefing and, in those cases, the court will cite the relevant documents in other locations in the record, for example, exhibits to the complaint.

provided that, on May 6, 2009, "the Office of Code Enforcement received a complaint alleging violation(s) of [the PM Code] on [their] property." (D.I. 40 at SJ36) Plaintiffs were informed that, on or after May 18, 2009, the property would be inspected and "a $50 ticket will be issued for each and every violation found." The courtesy letter provided a list of ten potential offenses,[9] but did not specify which was the subject of the May 6 complaint. Plaintiffs were advised that "[t]o avoid receiving a ticket(s) please carefully read the Instant Ticketing Process below and make sure your property is free from **any and all** of the above violations." (Id.) (emphasis added)

On May 12, 2009, Mr. Morris executed a "Request for Extension to Comply" with New Castle County Code Enforcement. (D.I. 39, ex. B) The form request listed Yasik as the Code Enforcement Officer, and stated that plaintiffs were "out of town until May 21, 2009." (Id.) Plaintiffs requested an extension through May 31, 2009 and provided the following "plans for project completion and code compliance;" the "brush pile will be modified per inspector/enforcement officer's requirement. Kerns Brothers will do the work." (Id.) On May 20, 2009, the National Wildlife Federation ("NWF") sent plaintiffs a letter recognizing the brush pile as an official Certified Wildlife Habitat site, along with "Backyard Wildlife Habitat" certificate No. 118,999. (D.I. 1, ex. M)[10]

Yasik states that he met with Mr. and Mrs. Morris at their request at the property

---

[9]Specifically: (1) overgrown grass; (2) accessory structure in disrepair; (3) vehicles or trailers stored on the property; (4) junk, debris, or trash; (5) trash and garbage accumulation or improper disposal; (6) oversized vehicle; (7) vehicle parked on the lawn; (8) outdoor storage of household items; (9) swimming pool maintenance; or (10) unkept bushes, shrubs and trees. (D.I. 40 at SJ36)

[10]The details surrounding plaintiffs' application to the NWF remain unclear. The parties do not discuss the brush pile's protected status on summary judgment.

on May 29, 2009 prior to the first scheduled inspection following the courtesy letter.

(D.I. 38, ex. 4 at ¶ 4)

> The conversation focused on the pile of yard debris being a compost pile, I advised them that the pole needed to be better defined and within some sort of fencing or container much like the compost bins next to their driveway. Mrs. Morris felt the pile was acceptable, but that they would research information on the proper construction of a compost pile.

(Id.) According to Yasik, he performed a first inspection on June 5, 2009. Although he determined that the pile of yard debris remained, he was not able to take adequate pictures due to the weather and did not issue a ticket on that date. (Id. at ¶ 5) Yasik returned on June 15, 2009 and found a "Backyard Habitat" sign next to the pile. After confirming with the Delaware Nature Society that they had issued the sign to the Morrises, and assuming that the program was administered by the State of Delaware, Yasik states that he closed the case as of June 18, 2009. (Id. at ¶ 6)

Another complaint about the brush pile was received by defendant on July 1, 2009, on which date Yasik again inspected the property and informed plaintiffs that the case was reopened. (Id. at ¶ 7) Yasik states that he advised Mrs. Morris that he had consulted with his superiors and the Delaware Nature Society and was informed that backyard habitats are still required to comply with New Castle County Code. (Id.) Yasik warned Mrs. Morris that if a violation continued he would issue a ticket. (Id.)

Yasik reinspected the property on July 3 and July 22, 2009 – dates that were automatically generated by defendant's computer system. (Id. at ¶ 8) Yasik did not issue tickets on those dates "because [he] saw [that] the Morris[es] were trying to resolve the issue and [he] felt a ticket was not required." (Id.) Yasik emailed Mr. Morris

11

on August 25, 2009 notifying him that he had been informed to treat the case as a "standard debris case" and was scheduled to reinspect the property on September 8, 2009, at which time he would issue a ticket if no progress was made. (D.I. 38, ex. C) The property was inspected on September 10, 2009, at which time Yasik did not issue a ticket. (D.I. 38, ex. 4 at ¶ 8)

On September 18, 2009, plaintiffs (through counsel) informed Yasik that Mrs. Morris disagreed with defendant's position on the brush pile but would "[re-]construct a brush pile that is satisfactory to her," after which defendant would be notified regarding reinspection. (D.I. 38, ex. D) Following another inspection on October 1, 2009, Yasik issued an instant ticket (no. 979023) on October 2, 2009 (hereinafter, the "October 2 ticket"). (Id. at ¶ 9; D.I. 40 at SJ39-SJ41) The ticket characterized the violation as the "outside storage of debris," in violation of PM 302.11, and assessed a $50 fine. (Id.) Plaintiffs were advised that, for each twenty-four (24) hour period that the violation continued, a new civil penalty could be assessed, and that initial and additional civil penalties would double if not paid within thirty (30) days of the respective citations. (Id.) An information sheet provided with the ticket detailed plaintiffs' right to appeal: (1) each penalty must be appealed separately to the Department of Land Use within 21 days of the citation; (2) the appeal should be addressed to the Hearing Officer and consist of an appeal form along with a "detailed explanation of their grounds for the appeal;" (3) "[t]he ticket must be paid in order for an appeal to be received;" and (4) a decision would issue in writing within forty-five (45) days. A website address for the "Appeals Form" and the address to mail the appeal were provided. (Id.)

Plaintiffs (hereinafter through counsel) attempted to appeal the October 2 ticket

to the Department of Land Use by filing the appeal form without advance payment of

the $50 civil penalty; the form was returned on October 15, 2009 with a letter stating

that an appeal would not be considered without full payment of the civil penalty. (D.I.

38, ex. E, ex F) Also on October 15, 2009, the Office of Code Enforcement issued

instant ticket no. 984803 to plaintiffs for failure to remedy the first cited violation

(hereinafter, the "October 15 ticket"), whereby plaintiffs were informed that their civil

penalties now totaled $100. (D.I. 1, ex. H)[11]

Plaintiffs filed another request for an extension to comply on October 23, 2009,

stating as follows:

Property owners are advised by counsel that condition is not a violation of the
New Castle County Property Maintenance Code. What the Officer characterized
as "debris" is in fact part of a Backyard Wildlife Habitat. Attached is a certificate
of recognition to that effect. To remove the "debris" would destroy the habitat. If
it is ultimately determined that our habitat is in violation it would be removed
promptly.

(D.I. 38, ex. G) Barbara Scott-Cooper ("Scott-Cooper"), a Complaints Specialist

assigned by defendant to supervise its Code Enforcement Officers, was the individual

who received plaintiffs' October 28, 2009 request for an extension of time. (D.I. 38, ex.

1 at ¶¶ 3-4) Scott-Cooper claims that she reviewed the file, containing photographs

(taken September 9, October 1, October 14, and October 26, 2009) which she

considered to depict "piles of branches strewn across the property" rather than a wildlife

habitat. (Id. at ¶ 6) Considering this and also the facts that Yasik had been working

diligently with plaintiffs and that plaintiffs had already received a prior extension (on May

---

[11]The court cites certain documents attached to the complaint that were not
resubmitted on summary judgment; such documents bear a citation associated with D.I.
1.

13

19, 2009), Scott-Cooper decided to deny the request for another extension. (*Id.* at ¶¶ 6-8)

On October 26, 2009, plaintiffs remitted $100 with an appeal form and an explanation that the brush pile was a "Community Wildlife Habitat" per the Delaware Nature Society. (D.I. 38, ex. H) By a letter dated November 3, 2009, plaintiffs were advised by Scott-Cooper that "[w]e have received your request for an extension [of time to correct the code violation pending appeal] and this letter is to inform you that your request has been **denied**." (D.I. 38, ex. I) (emphasis in original) No reason for the denial of an extension was given in this letter. Meanwhile, a third ticket had issued to plaintiffs on October 28, 2009. (D.I. 38, ex. J) (referencing ticket no. 989332)

On November 5, 2009, Vincent G. Kowal ("Kowal"), Administrative Hearing Officer with the Department of Land Use, issued a letter to plaintiffs entitled "New Castle County Code Official Notice of Instant Ticket Appeal Decision" addressing plaintiffs' appeal dated October 15, 2009 concerning the first two tickets (the "November 5 decision"). (D.I. 38, ex. J) In denying plaintiffs' appeal, Kowal recognized plaintiffs' "attempt to provide a habitat for friendly creatures" but expressed concern that "brush piles can also provide an attraction for pests such as rats and snakes."[12] (*Id.*) Although plaintiffs' appeal for the October 5 and October 15 tickets was denied, the October 28 ticket was vacated "[b]ecause of the crossing of [ ] communication via the

---

[12]In his affidavit, Kowal states that the reason for his denial of plaintiffs' appeal was "based on the code which did not exclude wildlife habitats from the definition of rubbish." (D.I. 38, ex. 3 at ¶ 11) This rationale is not included in Kowal's correspondance.

14

U.S. Postal Service."[13] (*Id.*) Plaintiffs were reminded that "a new citation can be issued once for each twenty-four (24) hour period the condition remains" and that the November 5 decision could be appealed to the BLIR. (*Id.*)

Scott-Cooper states that, on November 13, 2009, she contacted the Delaware Nature Society regarding potential resolutions to the situation. (D.I. 38, ex. 1 at ¶ 8) It was her understanding from that call that there were many ways for plaintiffs to create a backyard habitat without maintaining piles of branches on the property. (*Id.*) It was also Scott-Cooper's understanding that the Steward for the Backyard Habitat program (with whom she had spoken) would visit plaintiffs at the property to "work with the occupants on creating a habitat that did not include the use of debris." (*Id.*) This was conveyed to plaintiffs' counsel on November 13, 2009. (*Id.* at ¶ 9) Scott-Cooper was not aware of plaintiffs' first appeal at this time. (*Id.* at ¶ 10)

On November 16, 2009, plaintiffs attempted to appeal the November 5 decision to the BLIR by filing a form "Application for Hearing before the Board of License, Inspection & Review" with the Department of Land Use. (D.I. 38, ex. L) Plaintiffs provided a copy of the NWF's recognition of the brush pile as a Backyard Wildlife Habitat and an explanation that Community Wildlife Habitats were being encouraged in the area. (*Id.* at ex. L, ex. N) Also on November 16, 2009, plaintiffs sent a letter to David Culver ("Culver"), General Manager of the Department of Land Use, enclosing a copy of their application for a BLIR hearing and asking that "further enforcement be stayed pending the Board's decision and all further proceedings in this matter pursuant

---

[13]It is Kowal's own policy to vacate tickets issued pending appeal. (D.I. 38, ex. 3 at ¶ 12) Kowal states that he developed this policy in March 2009. (*Id.*)

to PM § 106.3.1.5.6." (D.I. 40 at SJ69)

The following day, plaintiffs' appeal to the BLIR was rejected and returned because plaintiffs neglected to pay the applicable $500.00 non-refundable filing fee to the BLIR. (D.I. 38, ex. M) Plaintiffs re-filed their papers on November 20, 2009 with the $500.00 fee. (Id., ex. N) An instant ticket (no. 995682) was issued to plaintiffs on November 23, 2009. (D.I. 40 at SJ70) Plaintiffs sent a follow-up letter to Culver on November 30, 2009 reiterating that they asked for a stay of enforcement and requesting that the November 23, 2009 ticket be withdrawn. (Id. at SJ82-83)

A hearing on plaintiffs' appeal (from the November 5 decision) was held before the BLIR on December 23, 2009. (D.I. 38, ex. O) The hearing was scheduled 27 days after defendant received the re-filed appeal, exclusive of the day of receipt.[14] (D.I. 38 at 13) At the conclusion of the December 23, 2009 hearing, the BLIR announced verbally its decision that it was reversing Kowal's decision insofar as plaintiffs did not violate the 2008 PM Code. "[C]ounsel for all concerned agreed to an extension of the date for the publication of the Board's written decision." (Id.) No written decision issued by the date the complaint in this case was filed on February 1, 2010. On March 1, 2010, an "Instant Ticket Statement" was mailed from defendant to plaintiffs assessing the $50 penalty from the November 23, 2009 ticket along with a $50 fee for nonpayment. (D.I. 40 at SJ71) It is not clear whether (and when) the November 23, 2009 instant ticket and/or the late penalty was voided, but there is no indication that these were paid nor any

_____

[14]According to Elizabeth Bartholomew, Kowal's assistant, it is often difficult to coordinate a hearing date because the BLIR members are volunteers and not defendant's employees. By implication, December 23, 2009 was the first date she was able to schedule the panelists. (D.I. 38, ex. 5 at ¶ 4)

16

allegation by plaintiffs that they are owed a refund in this regard.

The BLIR issued its written decision on March 15, 2010, wherein BLIR noted, *inter alia*, that: (1) plaintiffs tend to the brush pile daily; (2) it existed without complaint for 25 years; (3) the brush pile has a living ecosystem and is visited regularly by birds, rabbits and chipmunks; (4) neither snakes nor vermin have been seen or reported in connection with the brush pile; and (5) the brush pile does not include debris or trash. (D.I. 38, ex. O) After noting further the County's arguments, the BLIR voted (2 to 1) to grant plaintiffs' appeal for the following concise reasons:

> The materials in Applicants' back yard are not stored materials. The materials are part of a living ecosystem and natural habitat. There is constant turnover of the materials used in the brush pile and the materials do not fall into the category of rubbish or debris. The Applicants' brush pile is not in violation of the Code sections cited by the Department. The Board did not reach the constitutional issue [raised].

(*Id.*) Defendant refunded plaintiffs' $100 – the amount paid in connection with plaintiffs' October 2 and October 15, 2009 tickets – in April 2010. (D.I. 40 at SJ51)

### C. The 2008 PM Code as Currently Applied

In its papers, defendant emphasizes that, in view of the current litigation, it has effectuated certain changes in its administration of the ITS. James Smith ("Smith"), the Assistant General Manager for the Department of Land Use, testified that defendant modified its use of the courtesy letter in November 2009. (D.I. 41, ex. 2 at 6-7) The letter now describes which of the (ten) potential violations were actually observed on the property. (*Id.*) Smith also states that a draft policy went into effect in October 2010 whereby a second ticket is not issued for thirty (30) days in order to be sure that a ticketed party does not take appeal within the twenty-one (21) days allotted. (*Id.* at 110-

12) If an appeal is filed, "that's communicated back to the support staff and code enforcement and they go into the case and manipulate it further to make sure that no tickets will be heard pending the outcome of that appeal." (*Id.* at 112) Smith testified that he did not believe that a stay pending appeal to the BLIR need be requested under the "new program," insofar as ticketing is already placed on hold pending appeal, or until it's "finally resolved." (*Id.* at 113) As noted previously, it is also Kowal's policy not to issue tickets during the pendency of an appeal. (D.I. 38, ex. 3 at ¶ 12) Finally, defendant emphasizes Smith's testimony that Code Enforcement has never issued tickets on a daily basis. (D.I. 41, ex. 2 at 20, 46, 97) Smith stated that "we've never used [the power to ticket daily], although we would reserve that power, as we do with all our code violations. . . And that would be for someone who's really egregious that has significant problems that are really bringing down the community." (*Id.* at 97)

## III. STANDARD

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*,

18

57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Applicable Law

Plaintiffs bring the current action under 42 U.S.C. § 1983 alleging that the enforcement of the 2008 PM Code using the ITS violates the Fourteenth Amendment, which provides that a State may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. A court must evaluate a procedural due process claim in two stages. It must determine whether the plaintiff has "a property interest protected by procedural due process" and, thereafter, determine "what procedures constitute 'due process of law.'" *See Schmidt v. Creedon*, — F.3d —,

19

2011 WL 1134259, *6 (3d Cir. 2011) (citation omitted). The court has previously found that

> [p]laintiffs have established protectable property interests, both in the unrestricted use and enjoyment of their land, *see Acierno v. New Castle County*, Civ. No. 93-579, 1995 WL 704976 at *17-18 (D. Del. Nov. 1, 1995), and in maintaining the use of their money between "(a) the time of paying the [instant ticket] and (b) the time of [review.]" *See City of Los Angeles v. David*, 538 U.S. 715-17 (2003).

(D.I. 24) The court now further evaluates plaintiffs' claim that due process requires a hearing prior to the deprivation of either property right.[15]

Under *Mathews v. Eldridge*, 424 U.S. 319 (1976) (hereinafter, "*Mathews*"), the following factors must be considered in determining what process should be afforded:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335. Further,

> [a]n "as-applied" challenge consists of a challenge to a regulation's application only to the party before the court. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758-59 [ ] (1988). If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable. *Id.*

*Newsom ex rel. Newsom v. Albemarle County School Bd.*, 354 F.3d 249, 257 n.4 (4th

---

[15]Plaintiffs do not argue that the ITS is unconstitutional on its face. (D.I. 45 at 2) Rather, plaintiffs argue that, as applied, the 2008 PM Code violates their procedural due process rights according to the standards set forth in *Mathews*.

The court agrees with defendant that plaintiffs commingled arguments relating to a facial challenge of the Code with an "as applied" procedural due process theory. Insofar as plaintiffs clearly state in their reply papers that they do not pursue a facial challenge, the court will evaluate only whether defendant's **enforcement** of the 2008 PM Code (using the ITS) violates procedural due process.

Cir. 2003); *Accord, e.g. U.S. v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) ("An as-applied [constitutional] attack [ ] does not contend that a law is unconstitutional as written but that its application to a **particular person under particular circumstances** deprived that person of a constitutional right.") (emphasis added). Therefore, the court's review of the *Mathews* factors focuses on the 2008 PM Code as it was applied to plaintiffs in this case, not as it was or may be applied to other individuals.

## B. *Mathews* Factors

### 1. Private interests

According to plaintiffs, "[t]he private interests at stake are the homeowner's right to use their property as they wish, and keep the money they earn, until they have **some opportunity to be heard** in defense of defendant's charge that they have committed a violation." (D.I. 39 at 15; *see also* D.I. 45 at 3) (emphasis added) Here, plaintiffs paid $100 in civil penalties for their October 2 and 15, 2009 tickets in order to appeal their tickets to the Kowal.[16] The Supreme Court has previously held that the deprivation of a monetary interest – or "the private individual's interest in maintaining the use of money between (a) the time of paying [the ticket(s)] and (b) the time of the hearing" – is far less serious a harm than, for example, the deprivation of employment. *See City of Los*

---

[16]Plaintiffs do not specifically identify which fees make up the monetary interest at stake here. Plaintiffs' argument that fees must be paid before they have any opportunity to be heard appears to target the prepayment of civil penalties before the first round of appeal pursuant to 2008 PM Code Section 106.3.1.2.4. (D.I. 43 at 10-11; D.I. 45 at 4) Plaintiffs address the $500 BLIR appeal fee paid by them in the context of the risk of erroneous deprivation. (D.I. 45 at 5) While plaintiffs discuss the risk of "thousands of dollars in fines and non-payment penalties" and potentially the ultimate loss of a home at Sheriff's sale, these consequences were not borne by plaintiffs, and the court is not asked to undertake a facial review of the statute. (D.I. 39 at 17)

*Angeles v. David*, 538 U.S. 715 at 717-18 (2003) (finding that the city's 27-day delay in affording a vehicle impound hearing did not violate federal due process); *see also Mathews*, 424 U.S. at 340-41 (distinguishing the deprivation of monetary benefits "not based upon financial need" and assistance "given to persons on the very margin of subsistence"). Here, $100 is a small interest. Plaintiffs' monetary private interest is further minimized by the fact that plaintiffs do not allege that the deprivation worked a serious harm upon them. *See City of Los Angeles*, 538 U.S. at 718 (endorsing the government's view that "any loss in the time value of the money can be compensated by an interest payment").

Plaintiffs mention briefly their property right in the unrestricted use and enjoyment of their land. *See Acierno v. New Castle County*, Civ. No. 93-579, 1995 WL 704976 at *17-18 (D. Del. Nov. 1, 1995) (citing *Parratt v. Taylor*, 451 U.S. 527, 536-37 (1981)). Insofar as defendant did not remediate or abate plaintiffs' brush pile,[17] or otherwise disturb the brush pile, no deprivation of plaintiffs' rights occurred in this sense. Plaintiffs point to no caselaw establishing a right to the unrestricted enjoyment of land free of risk or threat of future governmental action vis a vis the property.

### 2. Risk of erroneous deprivation

Plaintiffs' arguments on this factor are not entirely clear. Plaintiffs assert that "**continuous** ticketing for the same violation and the threat thereof creates a substantial risk of an erroneous deprivation **regardless of the frequency**." (D.I. 45 at 4) (emphasis added) Plaintiffs also assert that, as no oral hearing is provided at the first

---

[17](Section PM 106.3.1.4 (2008))

stage of review, "many times all of the issues considered by the [official] in the appeal are not addressed in the homeowner's letter." (*Id.* at 5) Plaintiffs do not identify why this is so. At her deposition, Mrs. Morris could only recall one thing that she omitted from her letter – a comment about rats and snakes, which would be, in hindsight, responsive to Kowal's ultimate denial of the appeal. (D.I. 38, ex. C2 at 40-42) Mrs. Morris testified, however, that in her mind the letter was "the best we could do" at the time it was sent. (*Id.* at 48-49) Mr. Morris testified that "Mr. Marconi sent in [ ] everything that we could have sent in at the time," and there was nothing that could have been added to the letter. (D.I. 38, ex. C1 at 45) While plaintiffs argue that "many times the written submissions of the accused homeowner do not address everything submitted by the code inspector in support of the charge," they do not point out what information was available to Kowal but allegedly withheld from them at that stage. (D.I. 43 at 6; D.I. 45 at 5) It is not disputed that, at the first level of appeal, there are no limitations imposed on the type or quantity of material submitted as the "written explanation" for the grounds of appeal. (Section PM 106.3.1.2.4 (2008))

Plaintiffs also argue that the "second level of appeal does nothing to reduce the risk of an erroneous deprivation, [as the non-refundable $500 filing fee to the BLIR] deters appeals because the fee is at most times higher than the amount of the fines at stake in the appeal." (D.I. 45 at 5) Plaintiffs emphasize that their appeal was the only appeal taken to the BLIR, and it was successful. (D.I. 40 at SJ-92) Between July 2009 and November 2010, 1474 counts (from 557 tickets) were appealed to the first stage, of which 709 counts were overturned and 720 were upheld – a ratio of approximately 1:1. (*Id.* at SJ91-SJ92) Plaintiffs further argue that the ITS post-deprivation proceedings are

not prompt, nor was the return of their money in this case. (D.I. 45 at 5) Plaintiffs suggest alternatives by which defendant could improve upon its ITS procedure, in their view.[18] (D.I. 39 at 18; D.I. 43 at 11-12)

Defendant points out that the violations subject to the ITS are relatively straightforward – for example, overgrown grass, unkept bushes, shrubs, and trees, structures in disrepair or debris on the premises. (D.I. 40 at SJ36; Section PM Code 106.3.1.2 (2008)) The violation is photographed and reviewed before a ticket is issued. (D.I. 41, ex. 2 at 21; D.I. 43 at 6[19]) The foregoing should indicate that the risk that a ticket will be issued incorrectly in the first instance is relatively low, however, the near 1:1 reversal of ticketed counts at the first stage of review (by Kowal) cuts against this proposition.

### 3. Governmental interest

---

[18]Under the heading of erroneous deprivation, plaintiffs "suggest that defendant could easily implement some or all of the following: (i) staying all fines while a timely appeal is pending and informing the accused at the time of ticketing that an appeal will stay further enforcement; (ii) conducting a pre-deprivation Show Cause hearing [ ]; (iii) reducing the amount of time by which the homeowner must file their appeal to ten (10) days, and require the [code official] to decide the appeal within 20 days of the hearing; (iv) use the same administrative methods for the pre-deprivation hearings (i.e. scheduling hearings, setting up files and hearing rooms) as are currently used with Show Cause hearings; (v) do not require the Code inspectors to attend the pre-deprivation hearings and allow the [code officer] to thoroughly cross examine the accused homeowner on behalf of defendant; and (vi) dispense with the BLIR appeal and go directly from the [code official] to the Superior Court on writ of certiorari. These substitute procedures will allow a homeowner with an honest disagreement with defendant over the alleged violation to have an opportunity for a fair hearing, and not materially affect defendant's ability to ensure reasonably prompt compliance by those guilty of a violation." (D.I. 39 at 18)

[19]Although the copies of the citations of record do not appear to contain the photographs, plaintiffs concede that they are issued with the citations and do not dispute that this occurred in their case.

24

Plaintiffs do not dispute that defendant has a legitimate interest in enforcing the ITS to promote the public health, safety and welfare, with one exception. (D.I. 39 at 19) Plaintiffs indicate that "it appears unlikely that defendant really considers the common violations to be all that dangerous[, o]therwise, maintenance corporations owning property in residential subdivisions would not be totally exempt from the ITS[.]" (*Id.*) At his deposition, Smith explained that maintenance corporations, or corporations that generally own the common element in a neighborhood, are exempt from the ITS for several reasons: (1) boards of such corporations are volunteers; (2) once they become aware of a violation, it takes time for the volunteers to figure out who in the community is responsible; (3) the boards generally need to obtain members' approval before they take action, such as spending money to remediate the violation; and (4) by the time the corporation has control to act, several tickets may have issued. (D.I. 41, ex. 2 at 54-55) Plaintiffs do not address this evidence in their reply papers. (D.I. 45)

Currently, defendant employs 15 code enforcement officials, 2 of which do rental property inspections, and 13 of which are tasked with code enforcement, including the 2008 PM Code and ITS. (D.I. 40 at SJ84) Kowal, the sole Administrative Hearing Officer for the Department of Land Use, testified that he spends 15% of his time on ITS appeals. While plaintiffs suggest that Kowal can spend more of his time on such appeals, Kowal also testified that he spends the remainder (and the majority) of his time on rule-to-show-cause hearings, or bond process enforcement. (*Id.* at SJ75-SJ76) Smith testified that, in order for defendant to conduct full evidentiary hearings, another hearing office must be hired at Kowal's pay grade, which is between $80,000 and

$100,000 per year.[20] (D.I. 41, ex. 2 at 80-81) Defendant frames its interests as follows:

> The government interests include protecting the health, safety and welfare of the public. [D.I. 41, ex. 2 at 102] Providing for a full-fledged hearing on the record would require having to hire another hearing officer, adding support staff for the hearing officer, costs associated with keeping the building open late, including staffing security. [*Id.* at 85] It would require additional computer equipment, phone, desks and office space. [*Id.* at 91-92] It would require the Code Enforcement Officers to prepare for the hearing, wait for the hearing to convene and be present to give testimony through the hearing. [D.I. 38, ex. B6 at ¶ 13]

(D.I. 38 at 23; D.I. 41 at 11-12)[21] Plaintiffs do not point to contrary evidence. (D.I. 41,

D.I. 43) Plaintiffs argue primarily that defendant: (1) did not specify the alleged fiscal

burden; (2) derives significant revenue from the ITS; and (3) provided for hearings

under the 2005 PM Code. (D.I. 39 at 20) Nevertheless the foregoing evidence weighs

strongly in defendant's favor. *See City of Los Angeles*, 538 U.S. at 719 (holding that a

27-day delay in holding a hearing regarding the deprivation of $134.50 in automobile

towing fees "reflects no more than a routine delay substantially required by

administrative needs" and noting that such hearings would be "impossible if the city is to

be able to enforce [its] parking rules").

### 4. Discussion

As discussed above, plaintiffs had a diminutive interest in maintaining the use of

their $100 prior to Kowal's review of the first appeal. With respect to the third *Mathews*

factor, the parties agree that the government has a legitimate interest in enforcing the

ITS to promote the public health, safety and welfare. (D.I. 39 at 19) The record

---

[20]Kowal currently has one administrative assistant, who scheduled the BLIR hearing in this case. (*supra* n. 15; D.I. 40 at SJ80)

[21]In so arguing, defendant relies on Smith's testimony and, additionally, that of Martin Kirk, the Community Governing Administrator for New Castle County.

indicates that hundreds of instant tickets are issued under the ITS annually. Defendant has provided uncontraverted evidence that providing pre-deprivation hearings would effect a hardship upon it in terms of increased personnel and administrative costs. (D.I. 38 at 23; D.I. 41 at 11-12)

There are several arguments to be addressed with respect to the second *Mathews* factor, or risk of erroneous deprivation through the procedures used and the value of additional safeguards. As an initial matter, the ITS is not flawless. As the data indicates, the ticketing procedures used, which include photographing the violation following the code enforcement officer's visual inspection, do not avoid inappropriate ticketing almost 50% of the time.[22] Moreover, defendant states that it modified its use of the courtesy letter in November 2009 to better identify and describe the precise violation which may be subject to ticketing. (D.I. 41, ex. 2 at 6-7) While subsequent and duplicative tickets in certain cases could impart an improper deprivation of the civil penalties pending appeal, it is not clear from the record how often this has occurred.

Notwithstanding, the focus in this case is not on the accuracy of the ITS or the 2008 PM Code as applied to others, but as it was applied to plaintiffs. As discussed above, plaintiffs had a diminutive interest in maintaining the use of their $100 prior to Kowal's review of the first appeal. Plaintiffs argue that the lack of a stay in the 2008 PM Code pending the first stage of review increases the risk of an erroneous deprivation of ticket moneys pending appeals, insofar as property owners may continue to be ticketed until a stay pending appeal to the BLIR may be requested pursuant to Section PM

---

[22]For example, thus far in fiscal year 2011, of 88 counts appealed, 45 have been upheld and 43 reversed. (D.I. 40 at SJ91-SJ92)

106.3.1.6.6) (2008). (D.I. 45 at 6) While an express stay provision at the first stage would be valuable in preventing repeated ticketing and, potentially, the risk of erroneous deprivation of monetary interests, Kowal and Smith testified that they routinely stay further ticketing.[23] (D.I. 38, ex. 3 at ¶ 12; D.I. 41, ex. 2 at 110-13) In plaintiffs' case, only two tickets were received following the initiation of their appeal, spaced apart by several weeks.[24] The October 28, 2009 ticket was voided by Kowal, and while there is no specific indication that the November 23, 2009 ticket was voided, there is also no indication that it was paid (or pursued by defendant).

Certain safeguards inherent to the ITS – photographs and/or pre-issuance review – were insufficient to prevent plaintiffs' initial ticketing in this case. However, the conflict here was not borne of false information or description, rather, disputed opinion regarding statutory interpretation. The court discerns no additional or substitute procedural safeguards that would be useful under these circumstances. As detailed *supra*, Yasik spoke with plaintiffs before even the first ticket was issued. Although plaintiffs would prefer a predeprivation hearing, they had an opportunity to discuss their concerns with Yasik in person.

Plaintiffs generally complain that the $500 BLIR filing fee is unreasonable, both

---

[23]The court's primary concern in this case has been the tension between an owner's right to appeal and the provision in the 2008 PM Code allowing ticketing during the appeal process.

[24]This is consistent with Smith's (unrebutted) testimony that Code Enforcement has never actually issued tickets on a daily basis. (D.I. 41, ex. 2 at 20, 46, 97) Defendant's computer system automatically generates dates upon which subsequent inspections (and ticketing) may occur, and there is no indication that the reinspections are scheduled daily. (D.I. 38, ex. 4 at ¶ 4)

as excessive vis a vis the $50 civil penalty for the original citation and because it is nonrefundable even in the event of a successful appeal. However, plaintiffs do not specifically address the $500 fee in the context of the second *Mathews* factor. (D.I. 39 at 17-18; D.I. 43 at 11-12) Plaintiffs concede that "allowing the homeowner to appeal without prepaying the **fines** will likely increase the number of appeals above the current rate of 2.2% of citations." (D.I. 43 at 11) Under this rationale, allowing appeals to the BLIR with a lower (or with no) filing fee would, if anything, increase the number of appeals to that reviewing body. As discussed above, defendant has proffered evidence that predeprivation hearings would increase its administrative burden. Defendant contends that eliminating the $500 appeal fee would encourage frivolous appeals, and an increased number of appeals would be "unmanageable for the BLIR and [would] require numerous additional attorneys and support staff to process efficiently and quickly." (D.I. 40 at 15) Plaintiffs disagree, but do not point to contrary evidence or suggest an alternate regime.[25] (D.I. 43 at 12) There is no indication that the $500 filing fee worked a hardship on plaintiffs in this case.

The 2008 PM Code does not expressly provide timelines or other parameters for the repayment of fines. Plaintiffs in this case received their $100 about two and a half months after the issuance of the BLIR's written decision (by plaintiffs' count, 82 days).

---

[25]The court notes a lack of evidence of record specific to plaintiffs' proposals (*supra* n.18), for example, reducing the window for appeal from 20 to 10 days and lowering the number of days by which decisions need be rendered. While plaintiffs' suggestions appear practical, there is no testimony to this effect, and it is not clear whether (and how) they would impact defendant. While good ideas may exist to improve the 2008 PM Code, the court is not tasked with maximizing its efficiency – only with determining whether it satisfies procedural due process as contemplated under the Constitution.

(D.I. 40 at SJ51)  There is no indication of why such delay occurred, and additional safeguards to this effect would be valuable in preventing the erroneous deprivation of monetary interests.  Notwithstanding, the delay in this regard is not excessive.

Having evaluated the relevant *Mathews* factors, the court finds that the additional costs associated with providing a predeprivation hearing in this context outweigh its utility in reducing the risk of error, and that plaintiffs' interest in the prompt repayment of their civil penalty falls short of justifying a requirement that a predeprivation hearing be constitutionally required.  *See City of Los Angeles*, 538 U.S. at 717-18 (2003); *Reich v. Beharry,* 883 F.2d 239, 243 (3d Cir.1989) (delay in receiving payment pending litigation of breach of contract claim relating to services contract with public entity did not justify predeprivation procedures).

## V. CONCLUSION

For the foregoing reasons, the court denies plaintiffs' motion for summary judgment[26] and grants defendant's motion for summary judgment.  An appropriate order shall issue.

---

[26]While plaintiffs' motion was captioned a "motion for partial summary judgment," a review of plaintiffs' complaint indicates that their 42 U.S.C. § 1983 claim is plaintiffs' only count and, therefore, judgment for defendant is appropriate.  The court will deny plaintiffs' pending motion for class certification in view of its holding.